## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

BENNY J. WATSON,                     :
                                     :
            Plaintiff                :       No. 3:15-CV-1592
                                     :
      vs.                            :       (Judge Nealon)
                                     :
CAROLYN W. COLVIN, Acting            :
Commissioner of Social Security,     :
                                     :
            Defendant                :


## MEMORANDUM

On August 14, 2015, Plaintiff, Benny J. Watson, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying his application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §

1461, et seq.  (Doc. 1).  The parties have fully briefed the appeal.  For the reasons

set forth below, the decision of the Commissioner denying Plaintiff's application

for DIB will be vacated.


## BACKGROUND

_____

1.  Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

Plaintiff protectively filed[2] his application for DIB on December 7, 2012, alleging disability beginning on December 3, 2012, due to a combination of degenerative disc disease, spinal stenosis, and diabetes. (Tr. 22, 204, 207).[3] The claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on February 1, 2013. (Tr. 22). On February 21, 2013, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 22). A hearing was held on April 8, 2014, before administrative law judge Reana K. Sweeney, ("ALJ"), at which Plaintiff and an impartial vocational expert Nancy Harter, ("VE"), testified. (Tr. 22). On April 25, 2014, the ALJ issued a an unfavorable decision denying Plaintiff's application for DIB. (Tr. 22). On June 2, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 17). On June 18, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 3-5). Thus, the ALJ's decision stood as the final decision of the

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 1, 2015. (Doc. 12).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Commissioner.

Plaintiff filed the instant complaint on August 14, 2015.  (Doc. 1).  On December 1, 2015, Defendant filed an answer and transcript from the SSA proceedings.  (Docs. 11 and 12).  Plaintiff filed a brief in support of his complaint on February 16, 2016.  (Doc. 16).  Defendant filed a brief in opposition on April 20, 2016.  (Doc. 18).  Plaintiff filed a reply brief on May 4, 2016.  (Doc. 20).

Plaintiff was born in the United States on September 18, 1971, and at all times relevant to this matter was considered an "younger individual."[5]  (Tr. 204). Plaintiff did not graduate from high school or obtain his GED, but can communicate in English.  (Tr. 206, 208).  His employment records indicate that he previously worked as a diesel mechanic and truck driver.  (Tr. 209).

In a document entitled "Function Report - Adult" filed with the SSA on December 21, 2012,  Plaintiff indicated that he lived in a house with family.  (Tr. 215).  When asked how his injuries, illnesses, or conditions limited his ability to work, Plaintiff stated, "I have a constant pain due to my medical issues that makes

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

it that the more I move the worse it hurts.  I can't sit, stand, stoop, walk, lift, etc

for any length of time.  If I try to my legs go to sleep and the pain [] gets

unbearable.  I drive trucks for my job and I am not allowed to by law do (sic) to

being on insulin."  (Tr. 215).  From the time he woke up until he went to bed,

Plaintiff took "the kids to the bus stop."  (Tr. 216).  Plaintiff helped his children

with their homework, made them food, and helped them get ready for school.  (Tr.

216).  Plaintiff reported no difficulty with personal care, was able to prepare meals

daily for one (1) hour when his "back pain allow[ed]," do yard work until "the

pain makes [him] stop," and was able to drive a car and go out alone.  (Tr. 216-

218).  He went outside often, and shopped for groceries biweekly for three (3)

hours at a time with his wife.  (Tr. 218).  His hobbies included watching television

and fishing depending on his pain level.  (Tr. 218-219).   He spent time with his

family doing things like watching movies and playing games when he had the

time.  (Tr. 219).  He could walk for a block before needing to rest for about ten

(10) to fifteen (15) minutes.  (Tr. 220).  When asked to check what activities his

illnesses, injuries, or conditions affected, Plaintiff did <u>not</u> check talking, hearing,

seeing, memory, completing tasks, concentration, understanding, following

instructions, or getting along with others.  (Tr. 220).

Regarding his concentration and memory, Plaintiff did not need special

reminders to take care of his personal needs, take his medicine, or go places.  (Tr. 216).  He could count change, pay bills, handle a savings account, and use a checkbook.  (Tr. 218).  He could pay attention for about five (5) minutes,  was able to finish what he started, and handled stress and changes in routine "normally" and "good."  (Tr. 220-221).

Plaintiff also completed a Supplemental Function Questionnaire for pain. (Tr. 223).  He stated that his pain began in about 2004 due to disc degenerative disease, spinal stenosis, and five (5) bulging discs.  (Tr. 223).  He described his pain as constant pressure and pain that worsened over time, was located in his lower back and neck and spread down the back of both of his legs, was bad most days, and was not relieved by pain medication that caused side effects.  (Tr. 223-224).

At the oral hearing on April 8, 2014, Plaintiff initially testified that he had spinal decompression surgery on May 3, 2013.  (Tr. 54).  Plaintiff stated that, since the surgery, he still experienced numbness in his right leg and "a lot of pain in his lower back," but that the pain in his legs subsided considerably.  (Tr. 58).  He testified that he had not been exercising due to pain.  (Tr. 54).  Regarding medications for his pain, Plaintiff testified that he had taken morphine, tizanidine, and gabapentin.  (Tr. 55-56).  He stated he had not attended physical therapy as it

was not recommended by his doctor.  (Tr. 56).

Regarding a typical day, Plaintiff testified that he did the following: woke up at seven thirty in the morning, ate breakfast, took his medicine, and checked his blood sugar; prepared his children's breakfast and lunch boxes and walked them a quarter of a block to the bus stop at eight thirty in the morning; sat down on the couch because he would feel sleepy and usually sleep until eleven in the morning or noon; eat lunch and sit with his wife either talking or watching television; pick the boys up from the bus around four in the afternoon; take his medicine, check his blood sugar, and have dinner around five at night; and fall asleep after dinner until seven or eight at night.  (Tr. 62-66).  He testified that he lived in a two-story house, but that he did not go upstairs.  (Tr. 72).  He stated he did not do any chores around the house, but rather his wife did.  (Tr. 72-73).

When asked by the ALJ why he was unable to work, Plaintiff responded that it was due to back pain that occurred if he was doing anything out of the ordinary other than relaxing.  (Tr. 68).  He testified that Dr. Moore told him that he should not lift, push, or pull anything over ten (10) pounds, and that he should do only what felt comfortable.  (Tr. 70).

## MEDICAL RECORDS

On December 11, 2012, Plaintiff had an appointment with Renu Joshi, M.D.

at Pinnacle Health for diabetes management. (Tr. 292). Plaintiff's self-reported symptoms included increasing fatigue, nocturia, and weight loss. (Tr. 292). Plaintiff was compliant with his medication and follow-up appointments. (Tr. 292). His physical examination was normal. (Tr. 293-294). He was assessed as having uncontrolled diabetes, and was placed on medications, including Metformin, Simvastatin, Humalog, Tramadol, and Lisniopril. (Tr. 294).

On January 9, 2013, Plaintiff had an appointment with Paul Baughman, D.O. to become established as a new patient. (Tr. 299). It was noted that Plaintiff had lost over twenty (20) pounds in the prior four (4) to six (6) weeks and had improving energy levels. (Tr. 299). Plaintiff also discussed his chronic back pain, including a history of degenerative disc disease and spinal stenosis, and reported that his back pain was constant, located over the entire lower back and legs, was a 10/10, worsened as the day went on, caused significant difficulty with movement, and was not relieved by medication. (Tr. 299). His physical examination revealed he was obese, had a normal gait, had mild midline tenderness of his lumbar spine without pain on palpation and with limited range of motion, and had grossly intact sensation to light touch. (Tr. 300). Plaintiff was assessed as having Lumbago, Intervertebral Disc Degeneration of his lumbar spine, Radiculitis Thoracic or Lumbosacral Unspecified, Diabetes Mellitus, and Hyperlipidemia. (Tr. 300).

On January 23, 2013, Plaintiff underwent a consultative examination

performed by Thomas McLaughlin, M.D.  (Tr. 304).  Plaintiff reported that he had

constant pain in his lower back varying in intensity of a 5/10 to a 10/10 that

radiated into his lower legs after activities and standing and walking more than

one (1) block.  (Tr. 304).  He also stated that his pain worsened with bending,

walking, standing, or sitting for greater than ten (10) to fifteen (15) minutes, and

decreased with rest and a hot tub.  (Tr. 305).  His MRI showed disc disease with

spinal stenosis and bulging at L4/L5 and L5/S1 and disc disease at L3/L4 and

L4/L5.  (Tr. 305).  Plaintiff's examination revealed he had: normal ambulation and

gait; the ability to stand unassisted, rise from a seated position, and step up and

down from the examination table without difficulty; the ability to understand

"normal spoken speech and follow instructions;" a positive straight leg raise test

on the right to sixty (60) degrees; no tenderness over the cervical spine and no

evidence of paravertebral muscle spasm; nontender shoulders, elbows, wrists,

hands, knees, and hips; normal curvature of the dorsolumbar spine; the ability to

walk on his heels, toes, and heel-to-toe and to squat without difficulty; an intact

sensory exam to light touch, pinprick, and vibration as well as proprioception; 5/5

motor strength in the upper and lower extremities bilaterally; normal cerebellar

function; diminished deep tendon reflexes in the patellar and Achinlles; and +2/4

deep tendon reflexes in his biceps, triceps, and brachioradialis.  (Tr. 308-309).  Dr.

McLaughlin assessed Plaintiff as having lumbosacral disc disease with spinal

stenosis at the L4-S1 levels, diabetes mellitus type II, hypertension, hyperlipidema, and obesity. (Tr. 309). Dr. McLaughlin opined in a Medical Source Statement form of Plaintiff's Ability to Perform Work-Related Activities that he: (1) could frequently lift and/ or carry up to three (3) pounds and occasionally lift and/ or carry up to ten (10) pounds; (2) could stand and walk for up to two (2) hour in an eight (8) hour workday; (3) could sit for up to eight (8) hours in an eight (8) hour workday; (4) could engage in limited pushing and pulling in the lower extremities; (5) could occasionally bend, kneel, stoop, crouch, and balance, but never climb; (6) was limited in "feeling;" and (7) should avoid heights and moving machinery. (Tr. 311-312).

On January 23, 2013, Plaintiff underwent an x-ray of his lumbar spine. (Tr. 315). This revealed the following: (1) disproportionate moderately advanced degenerative disc disease at the lumbosacral junction; (2) mild levoscoliosis; and (3) mild degenerative sclerosis of both SI joints. (Tr. 315).

On January 28, 2013, Plaintiff had an appointment with Lucinda Sobkowiski, CRNP, for management of his diabetes. (Tr. 327). He reported that he had been experiencing blurred vision and increased fatigue. (Tr. 327). It was noted that he was excellently compliant with his medication. (Tr. 327). His physical examination revealed a normal range of motion, muscle strength, and stability in all extremities with no pain on inspection and a normal remainder of

the exam.  (Tr. 329).

On February 1, 2013, Laura Rumley, SDM, opined that, based on a review of the record up to that point, Plaintiff could: (1) occasionally lift and/ or carry twenty (20) pounds; (2) frequently lift and/ or carry ten (10) pounds; (3) sit, stand, and/ or walk for six (6) hours in an eight (8) hour workday; and (4) engage in unlimited pushing and pulling within the aforementioned weight restrictions.  (Tr. 102-103).  She opined that Plaintiff had no further restrictions.  (Tr. 103).

On February 5, 2013, Plaintiff had an appointment with Dr. Baughman for lower back pain.  (Tr. 351).  At this visit, Plaintiff's blood pressure was elevated, but he declined an increase in his blood pressure medication.  (Tr. 351).  Dr. Baughman prescribed Norco for Plaintiff's back pain.  (Tr. 352).

On February 19, 2013, Plaintiff had an appointment with Dr. Baughman for follow-up of his back pain, diabetes, and bilateral leg pain.  (Tr. 349).  Plaintiff reported that his pain was a 4/10 after taking Norco, that the Norco worked well for pain and helped him function, and that he took this medication every eight (8) hours.  (Tr. 349).  His blood pressured remained uncontrolled so Dr. Baughman increased the dosage of Lisinopril.  (Tr. 349).  His physical examination revealed he had mild midline tenderness of his lumbar spine; moderately limited range of motion with pain; bilateral positive straight leg raise tests; and grossly intact sensation to light touch.  (Tr. 350).

On February 27, 2013, Plaintiff underwent an MRI of his lumbar spine.  (Tr.

320).  It revealed that Plaintiff had "degenerative changes of the lumbar spin

resulting in canal and neural foraminal narrowings ranging from moderate to

severe.  (Tr. 320-321).

On March 14, 2013, Plaintiff had an appointment with Dr. Baughman for

lower back pain.  (Tr. 346).  He rated his back pain at a 10/10 without medication

and a 5/10 with Norco and noted that it had been worsening.  (Tr. 346).  His

physical examination was normal.  (Tr. 347).

On March 25, 2013, Plaintiff had an appointment with Lucinda Sobkowski,

CRNP, for diabetes management.  (Tr. 323).  It was noted that Plaintiff was

excellently compliant with medication and fairly compliant with his diet.  (Tr.

323).  Plaintiff reported that he was experiencing back pain and had planned to

follow-up with an orthopaedic physician.  (Tr. 324).  His physical examination

revealed normal range of motion, muscle strength, and stability in all extremities

with no pain on inspection; loss of protective sensation in his heels; and an

abnormal monolifament exam.  (Tr. 325).  Plaintiff was instructed to continue his

medications, and was scheduled for a follow-up visit in three (3) months.  (Tr.

325).

On March 28, 2013, Plaintiff underwent a sleep study.  (Tr. 362).  The

impression was that Plaintiff had severe Obstructive Sleep Apnea.  (Tr. 364).

On April 15, 2013, Plaintiff had an appointment with Dr. Baughman for diabetes management and back pain. (Tr. 342). Plaintiff noted his back pain was "pretty good" with Norco as long as he did not do anything active. (Tr. 342). He rated his back pain at a 5/10, and noted it was worse with activity and that he could function even though his back hurt. (Tr. 342). His physical examination was normal. (Tr. 343).

On April 16, 2013, Plaintiff had an appointment with Barry Moore, M.D., due to back pain. (Tr. 439). Plaintiff reported that his pain was moderate; was worsening; was located in his lower back and legs; radiated to his bilateral legs; was achy and sharp; was aggravated by bending, changing positions, daily activities, flexion, lifting, rolling over in bed, sitting, standing, twisting, and walking; and was relieved by pain medication and rest. (Tr. 439). Plaintiff's examination revealed: severe muscle spasms on both sides of the back; a positive straight leg test on the left side; bilateral weakness of dorsiflexion of both feet that was worse on the left side; absent deep tendon reflexes at the hamstring and left ankle; no sensory loss on his feet; and ambulation leaning forward while favoring his left leg when walking. (Tr. 443). Dr. Moore diagnosed Plaintiff with Lumbar Stenosis, and Plaintiff was scheduled for surgery. (Tr. 443).

On April 24, 2013, Plaintiff underwent a CPAP Titration study due to his diagnosis of severe Obstructive Sleep Apnea. (Tr. 368). The results were that

Plaintiff's apnea resolved with PAP therapy, and he was prescribed a CPAP prescription.  (Tr. 370).

On May 15, 2013, Plaintiff had an appointment with Dr. Baughman for chronic back pain that remained after his surgery with Dr. Moore.  (Tr. 339).  A physical examination was deferred due to Plaintiff's post-surgical status.  (Tr. 340).  Plaintiff was prescribed Norco from the pain.  (Tr. 341).

On May 29, 2013, Plaintiff had an appointment with Dr. Baughman for muscle spasms in his back and difficulty walking.  (Tr. 337).  He believed he had a blood sugar reaction to Baclofen and/ or Valium used to relieve muscle spasms.  (Tr. 337).  His physical examination revealed that he walked with a slow and stiff gait.  (Tr. 338).  Dr. Baughman recommended Plaintiff try Flexeril for his muscle spasms.  (Tr. 338).

On June 4, 2013, Plaintiff had his one month follow-up after his lumbar laminectomy.  (Tr. 445).  It was noted that he was ambulating well, but that he continued to have lower back pain.  (Tr. 446).  Dr. Moore prescribed Valium in addition to Flexeril for the spasms and nighttime pain.  (Tr. 446).  Plaintiff was scheduled for a follow-up visit in one (1) month.  (Tr. 447).

On June 12, 2013, Plaintiff had an appointment with Dr. Baughman for diabetes and back pain.  (Tr. 383).  His blood pressure was noted as being well controlled with Lisinopril.  (Tr. 383).  Plaintiff reported that he was taking Norco

for back pain every four (4) hours when active and every six (6) hours when inactive, that he used Valium at bedtime to reduce muscle spasms which worked "pretty good," that his pain was usually around an 8/10 with his medications, and that he had still been experiencing a burning pain in his thighs. (Tr. 383). It was noted that Dr. Moore told Plaintiff it could take up to three (3) years before he would see the complete effect of his surgery. (Tr. 383). His physical examination revealed he walked with a stiff gait; had mild midline tenderness of the lumbar spine with no pain with palpation of the lumbar musculature and limited range of motion with pain; and had no other abnormalities. (Tr. 384).

On July 1, 2013, Plaintiff had an appointment with Dr. Baughman for back pain and diabetes management. (Tr. 386). Plaintiff reported that his pain remained the same, was "pretty much good" if he remained inactive, had limited pain with sitting or walking short distances and activity around the house, rated it at a 4/10 after taking Norco, took the Norco every six (6) hours, and that his right lateral thigh was completely numb, but no longer burning. (Tr. 386). He stated he was waking up in pain throughout the night even though he was taking Valium, and believed this medication was not as effective as it used to be. (Tr. 386). He reported that taking Flexeril in the morning and afternoon reduced his spasms to a somewhat tolerable level. (Tr. 386). He also reported that he was able to stop taking Humalog because his diabetes was now "diet-controlled," but that he was

still taking Metaformin.  (Tr. 386).  His physical examination revealed that he had mild midline tenderness of the lumbar spine; no pain with palpation of the lumbar musculature; and limited range of motion with pain.  (Tr. 387).  It was noted that Plaintiff was agreeable with changing his pain medication from Norco to MS Contin as his pain was inadequately controlled.  (Tr. 387).  He was also instructed to consider increasing his Morphine dosage if necessary at his next appointment.  (Tr. 387).  Plaintiff discontinued Valium because it was no longer controlling his spasms.  (Tr. 387).

On July 15, 2013, Plaintiff had an appointment with Dr. Baughman for chronic back pain.  (Tr. 389).  He noted that the medication switch from Norco to MS Contin resulted in slight pain improvement, and stated that, "'It's pretty good but not enough.'" (Tr. 389).  He stated that he was always in pain, but the MS Contin "'just dulled it.'" (Tr. 389).  His left leg pain had also returned and was worse than what it was prior to surgery.  (Tr. 389).  Plaintiff's blood sugar levels had elevated slightly because he was not as active.  (Tr. 389).  His physical examination revealed he walked with a stiff gait; had mild midline tenderness of his lumbar spine; had no pain with palpation of the lumbar musculature; had limited range of motion with pain; and had grossly intact sensation to light touch.  (Tr. 390).  Plaintiff was instructed to increase the dosage of his MS Contin and to take Norco for breakthrough pain only if absolutely necessary.  (Tr. 390).  He was

15

also prescribed Celexa for depression due to chronic pain.  (Tr. 390).

On July 18, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. Moore.  (Tr. 449).  It was noted Plaintiff continued to have significant spasm on both sides of his lower back with parethesias and dysesthesias down his legs bilaterally that were related to nerve recovery.  (Tr. 450).  His symptoms were only relieved by lying down in bed.  (Tr. 450).  His physical examination revealed muscle spasms on both sides of his back; weakness of dorsiflexion of both feet; an L5 sensory loss of both feet; and ambulation leaning forward and favoring both legs when walking.  (Tr. 450).  Plaintiff was instructed to continue with his medications and return for a follow-up in two (2) months.  (Tr. 451).

On July 29, 2013, Plaintiff had an appointment with Dr. Baughman for low back pain.  (Tr. 392).  He noted that the MS Contin took his pain from a 10/10 to a 4/10, that he was still unable to be active, that he "'pays for it for days'" when he did chores or errands, and that his pain level was much better and he was more functional when he was not overly active.  (Tr. 392).  He also reported that had been experiencing increased fatigue and urinary hesitancy.  (Tr. 392).  His physical examination revealed he walked with a stiff gait; had mild midline tenderness of his lumbar spine; had no pain with palpation of the lumbar musculature; had limited range of motion with pain; and had grossly intact sensation to light touch.  (Tr. 393).

On August 29, 2013, Plaintiff had an appointment with Dr. Baughman for follow-up for his back pain.  (Tr. 395).  He rated his pain at a 4/10 when taking MS Contin.  (Tr. 395).  Plaintiff noted that he had not taken any Norco for breakthrough pain since his last appointment, but that he had been very inactive.  (Tr. 395).  It was also noted that he rarely had pain in his legs anymore, but did have a "'creepy crawly'" sensation in them for the past two (2) to three (3) weeks.  (Tr. 395).  He stated that his hands fell asleep at times and that he was dropping things.  (Tr. 395).  His physical examination revealed that he walked with a normal gait for his age; had mild midline tenderness of the lumbar spine and moderately limited range of motion with discomfort; and a had a depressed affect.  (Tr. 396).  Plaintiff was scheduled for a follow-up in one (1) month.  (Tr. 396).

On September 16, 2013, Plaintiff had an appointment with Lucinda Sobkowski, CRNP, for diabetes and hyperlipidemia management and for spinal stenosis of his lumbar region.  (Tr. 355).  It was noted that Plaintiff was fairly compliant with his diet and exercise and excellently compliant with his medication.  (Tr. 355).  His physical examination revealed normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  (Tr. 359).

On September 17, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. Moore.  (Tr. 452).  Plaintiff reported that he was still experiencing lower

back and leg pain that he described as persistent, achy, numb, and sharp; that was aggravated by bending, daily activities, extension, flexion, lifting, pushing, rolling over in bed, standing, twisting, and walking; and that was relieved by pain medication and rest. (Tr. 453). A review of symptoms noted that Palintiff had paresthesias in his hands, fingers, and legs; back pain; difficulty walking; and myalgia and muscle spasms in his neck and lower back described as moderate. (Tr. 453-454, 456). His physical examination revealed muscle spasms in both sides of the neck; a palpable lump just below the muscle attachments on the right side of the head; mild weakness of his triceps and finger extension bilaterally; absent deep tendon reflexes in his triceps and brachioradialis; and decreased sensation in the C6 dermatome bilaterally. (Tr. 456). The assessment noted that Plaintiff had signs and symptoms compatible with possible cervical stenosis, and Dr. Moore ordered a cervical MRI to assess this issue. (Tr. 456). Dr. Moore assessed Plaintiff as having Cervical Stenosis and a tumor of the soft tissue in his neck. (Tr. 456).

On September 26, 2013, Plaintiff had an appointment with Dr. Baughman for chronic pain, diabetes, and depression. (Tr. 398). It was noted that Plaintiff rated his pain at a 5/10, that his fasting sugar continued to be below one hundred forty (140), that he wanted to continue on his dosage of Villbryd for depression, that he was totally off Valium, and that he was taking Flexeril at bedtime. (Tr.

398).  His physical examination revealed that he walked with a slow gait; had increased range of motion, but no other changes from previous exams; and had a normal affect.  (Tr. 399).  Plaintiff was instructed to continue with his medications.  (Tr. 399).

On September 30, 2013, Plaintiff underwent an MRI of his cervical spine due to neck pain that radiated into his shoulder bilaterally and was associated with numbness, tingling, and weakness into his hands and a decreased range of motion. (Tr. 400).  Plaintiff also noted that his symptoms had been present for years, but that they had worsened since May 6, 2013.  (Tr. 400).  The impression was that Plaintiff had a small non-compressive central C5-C6 disc protrusion with moderate left-sided and mild right-sided C5-C6 foraminal narrowing with mild to moderate C5-C6 central canal stenosis.  (Tr. 400).

On October 31, 2013, Plaintiff had an appointment with Dr. Baughman for chronic back pain.  (Tr. 402).  Plaintiff noted that his pain was worse since his back surgery in May 2013, rated it at a 9-10/10 without medication and a 4-5/10 with MS Contin, and that he must be very inactive in order to maintain that level of pain control.  (Tr. 402).  He stated that shopping and taking his children to the bus stop exacerbated his pain.  (Tr. 402).  He continued to experience lower back spasms that caused frequent waking at night, and had pain in his legs bilaterally that worsened with prolonged standing.  (Tr. 402).  His physical examination

19

revealed he walked with a normal gait for his age and had grossly intact sensation to light touch. (Tr. 403). Plaintiff was agreeable to meeting with a pain management specialist to discuss alternative prescription options; wanted to try Tizanidine because the Flexeril did not seem to controlling spasms; and was scheduled for a follow-up visit in one (1) month. (Tr. 403).

On November 27, 2013, Plaintiff had an appointment with Dr. Baughman for chronic back pain. (Tr. 405). Plaintiff noted that his pain was a 5/10 on average and was constant even after taking MS Contin. (Tr. 405). He stated that walking his children to the bus stop caused significant pain. (Tr. 405). His physical examination revealed he walked with a stiff gait; had mild midline tenderness of the lumbar spine; had moderately limited range of motion with discomfort; and had grossly intact sensation to light touch. (Tr. 406). Plaintiff's MS Contin and Tizanidine dosages were increased. (Tr. 406). Plaintiff was scheduled for a follow-up in one (1) month. (Tr. 406).

On December 30, 2013, Plaintiff had an appointment with Dr. Baughman for chronic back pain and hypertension. (Tr. 410). Plaintiff noted that his insurance had been terminated, that he continued to take the medications that were covered by his insurance, that his back pain was uncontrolled despite an increase in his MS Contin dosage, and stated with regards to his pain, "'If I don't do anything, I'm for the most part okay. If I do anything, it's very bad.'" (Tr. 410).

His physical examination revealed he had uncontrolled blood pressure due to an inability to afford Lisinopril for the past few weeks since his insurance was terminated; walked with a normal gait for his age; and had grossly intact sensation to light touch.  (Tr. 410-411).  Plaintiff was instructed to continue on his medication regimen, and was scheduled for a follow-up visit in one (1) month.  (Tr. 411).

On January 29, 2014, Plaintiff had an appointment with Dr. Baughman for chronic back pain.  (Tr. 413).  Plaintiff noted that his back pain had worsened.  (Tr. 413).  He was agreeable to increase his Tizanidine dosage to reduce bedtime muscle spasms.  (Tr. 413).  His physical examination revealed he walked with a slow and stiff gait; used a cane to ambulate; and had grossly intact sensation to light touch.  (Tr. 414).  Plaintiff 's MS Contin and Tizanidine dosages were increased, and he was scheduled for a follow-up visit in one (1) month.  (Tr. 414).

On March 18, 2014, Plaintiff had an appointment with Dr. Moore for low back pain.  (Tr. 458).  Plaintiff reported that his pain was located in his lower back, and described the pain as deep, numb, sharp, and throbbing.  (Tr. 458).  It was aggravated by bending, changing positions, daily activities, extension, flexion, lifting, pushing, sitting, standing, twisting, and walking, and was relieved by pain medication and rest.  (Tr. 458).  His examination revealed muscle spasms on both sides of the back; a mild L5 sensory loss on the feet; mild weakness of

dorsiflexion of both feet; and ambulation leaning forward with a cane.  (Tr. 460).

Dr. Moore's assessment noted that Plaintiff had shown some improvement from

the surgery in May 2013 in his leg, but that he still had significant pain in his

lower back.  (Tr. 460).  He was scheduled for a follow-up in three (3) months.  (Tr.

461).

On March 20, 2014, Dr. Barry Moore completed a "Medical Source

Statement of Ability to Do Work-Related Activities (Physical)."  (Tr. 430).  He

opined that Plaintiff could: (1) occasionally lift up to ten (10) pounds and never

carry any amount of weight; (2) sit for twenty (20) to thirty (30) minutes and stand

or walk for ten (10) minutes at one time without interruption; (3) sit for two (2)

hours and stand or walk for one (1) hour in an eight (8) hour workday; (4)

ambulate fifty (50) feet without the use of a cane, which he deemed medically

necessary; (5) use his free hand to carry small objects while using his cane; (6)

never engage in reaching overhead, handling, or pushing or pulling bilaterally due

to severe back pain; (7) occasionally engage in all other reaching, fingering, and

feeling bilaterally; (8) never operate foot controls bilaterally due to constant

sensory loss; (9) never climb stairs, ramps, ladders or scaffolds, balance, stoop,

kneel, crouch or crawl; (10) never tolerate unprotected heights, moving

mechanical parts, humidity and wetness, dust and odors, and extreme cold and

heat; and (11) occasionally operate a motor vehicle.  (Tr. 430-435).

22

**STANDARD OF REVIEW**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence."  Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

　　　　"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

26

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through December 31, 2016.  (Tr. 24).  At

step one, the ALJ found that Plaintiff had not engaged in substantial gainful work

activity from his alleged onset date of December 3, 2012.  (Tr. 24).

At step two, the ALJ determined that Plaintiff suffered from the severe[6]

combination of impairments of the following: "obesity, diabetes mellitus,

degenerative disc disease of the lumbar spine with stenosis, and status post lumbar

laminectomy (20 C.F.R. 404.1520(c))."  (Tr. 24).

At step three of the sequential evaluation process, the ALJ found that

--------

6.  An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,
sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An
impairment or combination of impairments is "not severe" when medical and other
evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's
ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of section 1.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 25).

At step four, the ALJ made two separate determinations, stating the following:

> After careful consideration of the entire record, the undersigned finds that from the alleged onset date of December 3, 2012, to the spinal surgery date of May 6, 2013, [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) with normal breaks (as defined as fifteen - to - twenty - minute break in the morning and afternoon and a thirty-to-forty-five-minute break for lunch). [Plaintiff] is limited [to] occasional use of foot and leg pedals bilaterally, occasional climbing [of] ramps and stairs, and never climbing ropes, ladders, scaffolds, and poles.  He can stoop, kneel, crouch, and squat occasionally and must avoid crawling on hands, knees, or feet as part of the work.  He is limited to occasional concentrated exposure to extreme cold, to occasional work with hazardous machinery, and must avoid working with large vibrating objects or surfaces and work in high exposed places and around large fast-moving machinery on the ground.
>
> .................................................................................................
>
> After careful consideration of the entire record, the undersigned finds that from the May 6, 2013 lumbar surgery date forward, [Plaintiff] has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) with normal breaks (as defined as fifteen - to - twenty - minutes break in the morning and afternoon and a thirty-to-forty-five-minute break for lunch).

> [Plaintiff] must avoid foot and leg pedals bilaterally but no
> limitations with merely pressing a button or a knob.  He is
> capable of occasional climbing ramps and stairs and never
> climbing ropes, ladders, scaffolds, and poles.  He can stoop,
> kneel, crouch, and squat occasionally and must avoid crawling
> on hands, knees, or feet as part of the work.  Further, [Plaintiff]
> must have the option to perform the work either sitting or
> standing at the option of the individual without significant loss
> of productivity.  He is limited to occasional concentrated
> exposure to extreme cold and must avoid working with large
> vibrating objects or surfaces, working in high exposed places,
> working around large fast-moving machinery on the ground,
> and working with sharp objects.

(Tr. 26-34).

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, he was unable to perform past relevant work, but that given his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could perform for both aforementioned RFC time periods.  (Tr. 26-35).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time from December 3, 2012 through the date of the decision.  (Tr. 36).

**<u>DISCUSSION</u>**

On appeal, Plaintiff alleges that: (1) the ALJ erred in failing to acknowledge

Plaintiff's medical impairment of cervical spinal stenosis as established by the record; (2) the ALJ erred in determining Plaintiff's RFC; and (3) the VE's testimony is not substantial evidence to support the ALJ's decision that Plaintiff was not disabled.  (Doc. 16, pp. 9-15).  Defendant disputes these contentions. (Doc. 18, pp. 15-24).

### 1.    Cervical Spinal Stenosis Impairment at Step Two

Plaintiff argues that the ALJ erred in failing to "acknowledge and assess all medically determinable impairments established by the record," namely cervical spinal degeneration and stenosis.  (Doc. 16, pp. 10-12).

Step Two "'is a threshold analysis that requires [a claimant] to show that he has one severe impairment.'"  Traver v. Colvin, 2016 U.S. Dist. LEXIS 136708, at *29 (M.D. Pa. Oct. 3, 2016) (Conaboy, J.) (citing Bradley v. Barnhart, 175 F.App'x 87 (7 th Circuit 2006)).  SSR 96-3p states that an impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities."  SSR 96-3p.  An impairment is not severe if it is a slight abnormality that has no more than a minimal effect on the Plaintiff's ability to do basic work activities.  Id.  The United States Court of Appeals for the Third Circuit has held that as long as the ALJ finds at least one (1) impairment to be severe at Step Two, that step is resolved in Plaintiff's favor, the sequential

evaluation process continues, and any impairment that is found to non-severe is

harmless error because the ALJ still has to consider all impairments, both severe

and non-severe, in the RFC analysis.  See 20 C.F.R. §§ 404.1545(a)(2),

416.945(a)(2); see also Salles v. Commissioner of Social Security, 229 F. App'x

140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [the plaintiff's] favor at

Step Two, even if he had erroneously concluded that some of her other

impairments were non-severe, any error was harmless." (citing Rutherford v.

Barnhart, 399 F.3d 546, 553 (3d Cir. 2005))); Popp v. Astrue, 2009 U.S. Dist.

LEXIS, *4 (W.D. Pa. April 7, 2009) ("The Step Two determination as to whether

Plaintiff is suffering from a severe impairment is a threshold analysis requiring the

showing of only one severe impairment . . . In other words, as long as a claim is

not denied at Step Two, it is not generally necessary for the ALJ to have

specifically found any additional alleged impairment to be severe.") (citations

omitted).

     However, at Step Two, an administrative law judge also has an obligation to

consider all impairments established by the record, and failure to do so renders the

following steps of the Sequential Evaluation Process defective.  20 C.F.R. §

404.1545(a); Burnett v. Commissioner of Social Security Administration, 220 F.3d

112, 121-22 (3d Cir. 2000); Bailey v. Sullivan, 885 F.2d 52, 59-61 (3d Cir. 1989);

Hartzell v. Colvin, 2017 U.S. Dist. LEXIS 354, at *4 (M.D. Pa. Jan. 3, 2017)

(Nealon, J.) ("Moreover, unlike an error on the issue of severity, in most cases

where an ALJ errs by finding that an impairment alleged by the claimant is not

medically determinable[,] that error is not considered harmless.  All medically

determinable impairments must be considered at [S]tep [T]wo and accounted for

in the RFC assessment.  Case law is clear that an ALJ's failure to find an

impairment medically determinable at [S]tep [T]wo, or to support a finding that an

impairment is not medically determinable, makes the ALJ's finding at subsequent

steps of the sequential evaluation process defective and is cause for remand.");

Harris v. Astrue, 2012 U.S. Dist. LEXIS 73337, at *25-27 (M.D. Pa. May 25,

2012) (Nealon, J.) ("The record indicates that in addition to bipolar disorder,

borderline intellectual functioning and polysubstance dependence disorder that

was in remission, Harris was diagnosed with posttraumatic stress disorder,

schizoaffective disorder, attention deficit hyperactivity disorder and recurrent

major depressive disorder. The failure of the administrative law judge to find those

conditions as medically determinable impairments, or to give an adequate

explanation for discounting them, makes her decisions at steps two and four of the

sequential evaluation process defective."); Little v. Astrue, 2011 U.S. Dist. LEXIS

150308, at *25-26 (M.D. Pa. Sept. 14, 2011) (Kosik, J.) ("In this case, the record

suggests that Little suffered from a low back condition that caused pain. The

failure of the administrative law judge to find that condition as a medically

determinable impairment, or to give an adequate explanation for discounting it,

makes his decision at step four of the sequential evaluation process defective.  The

error at step two of the sequential evaluation process, draws into question the

administrative law judge's residual functional capacity determination and

assessment of the credibility of Little. The administrative law judge found that

Little's medically determinable impairments could reasonably cause Little's

alleged symptoms but that Little's statements concerning the intensity, persistence

and limiting effects of those symptoms were not credible. This determination by

the administrative law judge was based on an incomplete analysis of all of Little's

medically determinable impairments.”); Crayton v. Astrue, 2011 U.S. Dist. LEXIS

139414, at *54 (M.D. Pa. Sept. 27, 2011) (Caputo, J.) (“The record suggests that

Crayton suffered from several conditions in addition to the those found as severe

by the administrative law judge. The failure of the administrative law judge to find

the above noted conditions as medically determinable impairments, or to give an

adequate explanation for discounting them, makes his decisions at steps two and

four of the sequential evaluation process defective.  The error at step two of the

sequential evaluation process, draws into question the administrative law judge's

residual functional capacity determination and assessment of the credibility of

Crayton. The administrative  [*55] law judge found that Crayton's medically

determinable impairments could reasonably cause Crayton's alleged symptoms but

that Crayton's statements concerning the intensity, persistence and limiting effects

of those symptoms were not credible. This determination by the administrative law

judge was based on an incomplete analysis of all of Crayton's medically

determinable impairments.").  If an administrative law judge fails to do so, several

problems arise in the Sequential Evaluation Process steps that follow.  First, if an

impairment is not acknowledged at all at Step Two, it becomes impossible for this

Court to determine whether substantial evidence supports the ALJ's Step Three

determination.  Without an explanation provided by the ALJ, it cannot be

determined that Plaintiff would not meet a Listing at Step Three for a medically

determinable impairment that was never even acknowledged at Step Two because

Step Three regulations require a determination of the combined effect of all

medically established impairments.  See 20 C.F.R. §§ 404.1525-1526; Crayton v.

Astrue, 2011 U.S. Dist. LEXIS 139414, at *54 (M.D. Pa. Sept. 27, 2011) (Caputo,

J.).

Furthermore, if a medically determinable impairment is not acknowledged

at Step Two, it is then not taken into account in the RFC determination at Step

Four.   At Step Four, the administrative law judge has the responsibility to take all limitations from all medically determinable impairments, both severe and non-severe, into account in determining a plaintiff's RFC.  See 20 C.F.R. §§ 404.1525-1526; Hartzell v. Colvin, 2017 U.S. Dist. LEXIS 354, at *4 (M.D. Pa. Jan. 3, 2017) (Nealon, J.);  Harris v. Astrue, 2012 U.S. Dist. LEXIS 73337, at *25-27 (M.D. Pa. May 25, 2012) (Nealon, J.); Little v. Astrue, 2011 U.S. Dist. LEXIS 150308, at *25-26 (M.D. Pa. Sept. 14, 2011) (Kosik, J.);  Crayton v. Astrue, 2011 U.S. Dist. LEXIS 139414, at *54 (M.D. Pa. Sept. 27, 2011) (Caputo, J.).  Failure to do so renders the RFC determination defective because if all medically determinable impairments are not considered in this step, all the limitations caused by them are also not considered, which then leads to a potentially flawed RFC.

Additionally, not acknowledging a medically determinable impairment undermines the ALJ's credibility determination because any symptoms caused by an unacknowledged medically determinable impairment cannot be taken into account when determining the plaintiff's credibility if it is not recognized as existing.  See Mason v. Shalala, 994 F.2d 1058, 1068 (3d Cir. 1993); SSR 96-7p.

In the case at hand, even though the ALJ found several medically determinable impairments to be both severe and non-severe, she neglected to acknowledge or discuss the medically determinable impairment established by the

35

record, namely cervical degeneration and stenosis.  Due to this lack of

acknowledgment or discussion of this impairment, the ALJ then did not take this

impairment and the limitations it caused, including neck pain and the inability to

sufficiently hold onto items without dropping them, into account when evaluating

the Listings under Step Three and in determining the RFC and Plaintiff's

credibility, making the RFC and credibility determinations defective as discussed

by the aforementioned regulations and case law.  As such, because, at Step Two,

the ALJ failed to even acknowledge the medically determinable impairment of

cervical degeneration and stenosis that was in the medical record, the ALJ's Step

Two analysis is not supported by substantial evidence, nor are the remaining steps,

as an error at Step Two translates into errors in the following steps of the

Sequential Evaluation Process.  Because remand is warranted at this juncture, this

Court declines to address Plaintiff's remaining assertions.

## **CONCLUSION**

Based upon a thorough review of the evidence of record, the Court finds

that the Commissioner's decision is not supported by substantial evidence.

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

of the Commissioner will be vacated, the matter will be remanded to the

Commissioner for a new administrative hearing, and judgment will be entered in

favor of Plaintiff and against Defendant.

A separate Order will be issued.

**Date**: February 28, 2017


**/s/ William J. Nealon**
**United States District Judge**